UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-60073-CIV-DIMITROULEAS/SNOW

LETTY HERNANDEZ, et al.,

      Plaintiff,

v.

STARBUCKS COFFEE COMPANY,
a foreign corporation qualified to do
business in Florida as
STARBUCKS CORPORATION,

      Defendant.

_____/

**DEFENDANT STARBUCKS CORPORATION'S MOTION FOR
SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

I.   **INTRODUCTION**

Plaintiff Letty Hernandez is a former Starbucks store manager who claims that she was misclassified as exempt from the overtime requirements of the Fair Labor Standards Act.  She alleges that, although she was the highest ranking employee responsible for supervising up to 15 subordinate employees and managing the overall operation of her store, her actual day-to-day duties involved nothing more than working as a "glorified barista" and therefore she should have been paid overtime.  In addition to her individual claim, Hernandez also has sought to represent a class of all Starbucks store managers nationwide pursuant to the FLSA's collective action procedures, alleging that she and they are all "similarly situated."

Concurrently with the filing of this motion, Starbucks has filed a motion to decertify this case as a collective action because discovery clearly establishes that Hernandez and the opt-in plaintiffs are not "similarly situated" under her theory of the case.  This is because plaintiffs' allegations vary materially as to their responsibilities as store managers—the critical inquiry as to their exempt status.  Under these circumstances, the proper course is to strike Hernandez's collective action allegations and dismiss the opt-in plaintiffs without prejudice.

Although many of the 18 deposed plaintiffs provided testimony that conflicts not only amongst themselves but also with Starbucks' job expectations, at least four opt-in plaintiffs— Kevin Oscar Fredericks, Lisa Hughes, Elizabeth Thomas, and Jennifer Velletta—offered generally consistent testimony that compels the conclusion that they are exempt "executive" employees as a matter of law.  These plaintiffs admitted that they were the highest-ranking employees in Starbucks stores generating millions of dollars in annual revenue; they continuously supervised staffs of up to 37 employees that they recruited, hired, trained,

scheduled, directed, evaluated, disciplined, promoted, and terminated; they monitored their store's budget, ordered inventory, and took action to increase sales and control costs; and they were held responsible for the overall performance of their store and were paid significantly higher compensation as a result.  As one district court has already found, these undisputed facts render Starbucks store managers exempt as a matter of law.  *Mims v. Starbucks Corp.*, No. H-05-0791, 2007 WL 10369, 12 Wage & Hour Cas.2d (BNA) 213, 153 Lab. Cas. P 35, 244 (S.D. Tex. Jan. 2, 2007).  This district likewise has concluded that retail managers are exempt as a matter of law under similar circumstances based on "overwhelming and well-reasoned precedent."  *Posely v. Eckerd Corp.*, 433 F. Supp. 2d 1287, 1303 (S.D. Fla. 2006).

Summary judgment thus should be entered, at a minimum, against these four plaintiffs whose testimony conclusively establishes that they were properly classified as a matter of law. Starbucks anticipates that Hernandez will oppose summary judgment by arguing that the Court should not entertain summary judgment as to anything less than the entire class, or by attempting to create a factual dispute by pointing to testimony from different plaintiffs who claim to have had different work experiences.  But neither argument has merit.  A district court may entertain summary judgment motions as to individual plaintiffs even where, as here, a FLSA collective action has been conditionally certified.  Hernandez also may not oppose summary judgment by pointing to contradictory testimony from other plaintiffs.  The FLSA requires a review of the actual day-to-day job duties of an employee to determine their exempt status, and thus the fact that other employees performed their duties differently is immaterial where Fredericks, Hughes, Thomas, and Velletta have admitted to facts that render them exempt.

Because entry of summary judgment against these four plaintiffs is warranted under Fed. R. Civ. P. 56(c), either the class must be decertified or an order to show cause should issue as

why summary judgment should not be entered against all of the opt-in plaintiffs.  Hernandez cannot have it both ways.  If she is permitted to proceed collectively with representative testimony, then the outcome of the exemption analysis as to one "similarly situated" plaintiff must be the same for the others.   Conversely, if plaintiffs argue that the Court's ruling as to some plaintiffs should not bind the others, their claim that they are "similarly situated" must fail.  The Court cannot determine how to classify hundreds of absent class members if some of the testifying plaintiffs are exempt as a matter of law and others claim they are not exempt.

Starbucks also seeks summary judgment on two issues unrelated to plaintiffs' exempt status.  *First*, summary judgment should be entered on the claims of 155 plaintiffs because they accrued more than two years prior to the filing of their consent to join this lawsuit.  The FLSA's two-year statute of limitations may be extended to three years only if plaintiffs prove that the company's violation was "willful."  Plaintiffs cannot meet the burden to show the classification of Starbucks store managers as exempt was in "reckless disregard" of the law when a federal district court already has deemed it correct.  Any claims beyond the two-year limitations period thus must be dismissed.  *Second*, summary judgment should be entered against 17 plaintiffs that executed Court-approved agreements waiving the very claims they now assert.  These plaintiffs may not re-litigate their claims after giving them up in prior litigation.  Starbucks accordingly moves pursuant to Fed. R. Civ. P. 56 (c) for summary judgment on these claims.

## I.    SUMMARY OF UNDISPUTED FACTS

### A.    The Starbucks Store Manager Position

Starbucks operates more than 6,700 retail coffee and specialty stores across the United States.  (Statement of Facts ("Stmt. of Facts") ¶ 1.)  Each store is managed by a store manager,

and includes several subordinate "partners" (employees): 5-30 entry-level baristas, 3-6 shift

supervisors, and, in some stores, one or more assistant store managers. (*Id*. ¶¶ 1, 9.)

Store managers are subject to the same job description, which provides that the store

manager must:

> regularly and customarily discretion in managing the overall operation of the
> store… [and spend] a majority of the time… supervising and directing the
> workforce, making staffing decisions (*i.e.,* hiring, training, evaluating,
> disciplining, discharging, staffing, and scheduling), ensuring customer satisfaction
> and product quality, managing the store's financial performance, and managing
> safety and security within the store.

(*Id*. ¶¶ 2, 43.) The job description provides additional detail regarding store manager duties

under the categories of "leadership," "planning and execution," "business requirements," and

"partner development and team building." (*Id*. ¶ 2.)

Starbucks also discusses store manager responsibilities in its Partner Guide, which is

distributed to all partners upon their hire. (*See id*. ¶¶ 2-3.) The Guide notes that the "store

manager is ultimately in charge of all store operations and directs the work of the assistant store

managers, shift supervisors and baristas," and bears responsibility for "personnel decisions,

scheduling, payroll, and fiscal decisions." (*Id*. ¶¶ 1-3.) Elsewhere the Guide informs hourly

workers that, among other things, that the "responsibility of hiring store partners belongs to each

Starbucks store manager based on his or her store's particular business needs," and that the store

manager will determine the store's weekly work schedule, the type of discipline to be taken

within the store, and the performance evaluation given to each partner. (*Id*. ¶¶ 10, 18, 22, 29.)

These principles are repeated in the company's Partner Resource Manual, which vests the store

manager with authority to make decisions regarding hiring, scheduling, training, performance

evaluations, discipline, promotion, and other personnel issues. (*Id*. ¶¶ 10, 14, 18, 21, 22, 25, 29.)

**B.      Plaintiffs' Management Of Staff**

Plaintiffs Kevin Oscar Fredericks, Lisa Hughes, Elizabeth Thomas, and Jennifer Velletta managed Starbucks stores in Arizona, Illinois, and Florida during the relevant period.  (*Id.* ¶ 6.) They were the highest-ranking partner in their stores and were "ultimately in charge of all store operations" in an enterprise generating between $780,000 and $1.35 million in annual revenue. (*Id.* ¶¶ 2-4.)  Plaintiffs managed staffs consisting of nine to 37 partners, and occasionally managed more than one store at a time.  (*Id.* ¶¶  5, 9.)  The partners within the stores reported to plaintiffs and considered them their "boss."  (*Id.* ¶ 3.)

### 1.      Hiring, Training, Promotion, and Partner Development

Plaintiffs were responsible for interviewing, hiring, and promoting partners within their stores.  (*Id.* ¶¶ 10, 25.)  Plaintiffs called in applicants for interviews and evaluated their demeanor, work ethic, and answers to interview questions. (*Id*. ¶ 10.)  They also attended district "hiring fairs" where they interviewed applicants with other store managers.  (*Id*. ¶ 11.)  Plaintiffs made the final decision about which baristas to hire following these interviews.  (*Id.* ¶ 12.)

After a barista was hired, plaintiffs were ultimately responsible for ensuring they were trained.  (*Id.* ¶ 14.)  Plaintiffs conducted "First Impressions" sessions to orient new partners on company policies and procedures and plaintiffs' own expectations.  (*Id.*)  They also selected subordinate partners to assist with in-store training modules, or trained the new hires directly themselves.  (*Id.* ¶ 15.)  At the end of training, plaintiffs certified whether the new partner had mastered the requirements of the position.  (*Id.*)

In addition to conducting training for their own partners, plaintiffs also conducted district-wide training sessions for partners outside of their stores.  (*Id*. ¶ 16.)  Some training sessions, such as "Starbucks Experience" training, were directed towards large groups of new hires and subordinate partners.  (*Id.*)  Other sessions taught partners how to train and supervise

their co-workers, or were created by plaintiffs to address specific issues in their districts.  (*Id.*)
Plaintiffs created and taught their own in-store and district-wide training courses. (*Id.*)

Plaintiffs also were responsible for monitoring their partners' work performance and
identifying individuals that could be promoted to the next level. (*Id.* ¶¶ 24-25.) Plaintiffs worked
with promotion candidates to develop toward the new position, and then either made the decision
to promote them on their own or after discussing their recommendation with their district
manager.  (*Id.*)  Plaintiffs'  promotion recommendations were almost uniformly followed.  (*Id.*)

### 2.       Scheduling and Direction of Subordinate Work

Plaintiffs were responsible for setting the weekly schedules in their stores through the
company's "ALS" system.  (*Id*. ¶ 18.)  Plaintiffs would input employee availability information
into ALS together with their own assessment regarding their store's expected business volume
for each day of the week.  (*Id.*)  After ALS generated a draft schedule, plaintiffs would make
extensive revisions based upon the particular needs of their store, considering factors such as the
relative skill level of the partners on each shift, partner conflicts, and business factors not
recognized by ALS.  (*Id.*)  Plaintiffs also had authority to approve partner requests for vacation
or time off or to grant partners' requests for more or less hours. (*Id.* ¶ 19.)

Plaintiffs could assign work to their subordinates by writing assignments on the weekly
schedule.  (*Id.* ¶ 20.)  They also could direct their subordinates by verbally directing them when
they were in the store, filling out "Daily Coverage Reports," or specifying which partners would
perform tasks on a daily task list.  (*Id.*)  When in the store, plaintiffs also could deploy partners to
different work stations based upon their assessment of their skills or the needs of the store and
would monitor and correct partners based on plaintiffs' observations of their performance.  (*Id.*)

### 3.       Partner Evaluation, Discipline, and Discharge

Plaintiffs were responsible for completing performance evaluations every six months for each of the partners in their stores.  (*Id.* ¶ 22.)  Plaintiffs assigned grades to their subordinates performance in several different categories and provided written commentary on the partners' performance in each category.  (*Id.*)  Subordinate partners' eligibility for a raise and the amount of the raise were determined based on their overall evaluation score.  (*Id.* ¶ 23.)

In addition to completing regular performance reviews, plaintiffs also were responsible for coaching partners and disciplining them when they failed to follow Starbucks policies and procedures.  (*Id.* ¶ 27.)  Plaintiffs have discretion to determine whether or not to discipline partners in their stores.  (*Id.* ¶ 28.)  When a partner violated company policy, plaintiffs could choose to "coach" or verbally correct the partner, or issue a formal "corrective action" that was placed in the partner's personnel file.  (*Id.*)  Plaintiffs also had "sole discretion" to determine level of discipline to impose, and plaintiffs testified that they would assess discipline "situationally every time"  requiring them to make a "judgment call."  (*Id.* ¶¶ 28-29.)

Plaintiffs also were involved in the decision to terminate partners.  (*Id.* ¶ 30.)  Plaintiffs made the decision to terminate some partners on their own, and in other circumstances initiated the termination process by recommending to their district manager that particular partners be terminated.  (*Id.*)  Plaintiffs' termination recommendations generally were followed.  (*Id.*)

C.      **Plaintiffs' Management Of Store Business Operations**

In addition to their supervisory tasks, plaintiffs were held accountable for the overall performance of their store, regardless of whether they were at the store or not.  (*Id.* ¶ 31.)

1.      **Store Financial Performance**

Plaintiffs were responsible for monitoring the store's controllable costs budget and taking action to increase sales to meet annual revenue expectations.  (*Id.* ¶¶ 33-35.)  Plaintiffs reviewed

weekly store reports to analyze these issues and pursued a variety of strategies to achieve their

budget goals.  (*Id.* ¶ 34.)  For example, plaintiffs were responsible for monitoring and adjusting

their store's weekly orders for coffee, pastry, paper, and other supplies, and could adjust these

orders to avoid excess inventory or avoid shortfalls in necessary product.  (*Id.* ¶ 32.)  Plaintiffs

made these decisions based on their assessment of business trends and external factors that could

substantially increase or decrease business for their store.  (*Id.*)  Plaintiffs also could monitor the

store labor budget by scheduling effectively based on expected business volume, and then

adjusting their staff day-to-day to account for changes in volume.  (*Id.* ¶ 34.)

Plaintiffs also could take affirmative steps to increase store revenue by training partners

to "suggestive[ly] sell[]" or perform their tasks more efficiently, seeking out community

activities to market the company and their store, or setting goals or creating contests to

encourage partners to increase store revenue generally.  (*Id.* ¶ 33.)  Increasing sales also helped

plaintiffs meet their labor budget, because the store's labor standards moved up and down based

on how the store's sales compared to anticipated revenue.  (*Id.* ¶ 34.)

### 2.    Store Administration

Plaintiffs performed several administrative tasks and ensured compliance with company

policies relating to their store's day-to-day operation.  (*Id.* ¶ 36.)  Plaintiffs processed payroll,

approved missed punches, entered personnel changes into the company's computer system, and

maintained personnel records for their subordinates.  (*Id.*)  Plaintiffs also reviewed voice-mail

and e-mail for company announcements and filtered important communications for partners; and

ensured that inventory counts, ordering, and company task lists were completed.  (*Id.* ¶ 32, 37,

42.)  Plaintiffs also ensured that their stores complied with company policies regarding store set-

up, drink and pastry standards, cleanliness standards, safety and security requirements, and time

and attendance policies.  (*Id*. ¶ 26.)  Plaintiffs held the keys and alarm codes to the store and

plaintiffs were the first person contacted if the store alarm went off at night.  (*Id*. ¶ 38. )

Plaintiffs were called to handle store emergencies, or to provide direction to subordinate partners

on how to handle difficult situations.   (*Id*.)

### 3.    Management Meetings

Plaintiffs attended regular  management meetings with their district manager and the

store managers in their district.  (*Id*. ¶ 40.)  These meetings could involve discussions regarding

hiring and promotion strategies, "best practices" for managing stores, sales and budgeting issues,

and new company promotions and policies.  (*Id*.)  In addition, plaintiffs attended semi-annual or

annual regional management meetings, where store, district, and regional managers would

discuss key promotions and business issues.  (*Id*. ¶ 41.)  Plaintiffs attended a national meeting of

store, district, and regional managers regarding new company initiatives and other management

issues.  (*Id*.)  Plaintiffs also conducted store or shift meetings to inform and train their

subordinates of new products, promotions, and improve the team environment.  (*Id*. ¶ 37.)

### D.    Plaintiffs' Division of Work Time

Plaintiffs spent time during each workweek (1) "off the floor" performing exclusively

management work, and (2) "on the floor" where plaintiffs would "lead by example," direct

subordinate partners, issue discipline, and observe partners for purposes of evaluation and

promotion, while also assisting customers.  (*Id*. ¶ 43, 46.)  Plaintiffs' "off the floor" or non-

coverage time consists of managerial and administrative tasks, such as payroll, scheduling,

analyzing reports, ordering, interviewing, hiring, preparing evaluations, attending meetings,

teaching training courses, reviewing email, or work outside of the store.  (*Id*. ¶ 43, 44.)  Plaintiffs

spent 36-50 percent of their time solely on this work.  (*Id*. ¶ 44.)

In addition to this time "off the floor" focused exclusively on management tasks, plaintiffs "constantly" performed management functions while they were "on the floor" working as "coverage." (*Id.* ¶ 45.) While on the floor, plaintiffs were "constant[ly]" training partners; monitoring, directing and correcting their work; observing employees for purposes of drafting their evaluations; and motivating and training their partners by "leading by example." (*Id.* ¶¶ 45-46.) In addition, plaintiffs could perform management tasks such as completing the weekly schedule, drafting evaluations, and reviewing reports during slow periods while they were scheduled to be "on the floor." (*Id.* ¶ 46.)

### E.  **Plaintiffs' Compensation and Evaluation**

#### 1.  **Plaintiffs' Compensation**

As Starbucks store managers, plaintiffs were paid salaries ranging from $32,000 to over $50,000 per year. (*Id.* ¶ 47.) Their salaries were not subject to deductions based on how many hours they worked or how well they performed. (*Id.*)

Plaintiffs were also eligible for thousands of dollars in quarterly bonuses based on overall store revenue, ability to manage controllable costs, and the scores that their stores received during secret shopper visits. (*Id.* ¶ 48.) Plaintiffs received additional bonuses for training newly hired ASMs and store managers, opening a new store, and dual store managing. (*Id.*) Neither baristas nor shift supervisors were eligible to receive such bonuses. (*Id.*) Similarly, plaintiffs were eligible for several benefits not available to other partners, including paid holidays, paid sick days, and certain vacation benefits. (*Id.*)

Plaintiffs' compensation was significantly higher than the wages earned by their hourly-paid baristas and shift supervisors. (*Id.* ¶ 49.) Even taking into account the total number of hours that plaintiffs allege they actually worked per week and calculating a fictional "hourly

rate" plaintiffs still earned over 115 percent more than their baristas and 70 to 80 percent more than their shift supervisors did on an hourly basis.[1]  (*Id.*)

### 2.      Evaluation of Plaintiffs

Consistent with their job descriptions, plaintiffs were evaluated annually on management factors, including "leadership," "planning and execution," "business requirements," and "partner development and team building."  (*Id.* ¶ 8.)  Within these categories, plaintiffs' district managers reviewed their ability to staff the store, train partners, success (or failure) in directing, leading, and disciplining partners, and ability to manage scheduling, ordering, and other business metrics including taking action to drive sales.  (*Id.*)  By contrast, plaintiffs evaluated the shift supervisors and baristas in their stores on issues such as the manner in which they provided service, their competency in making drinks, and their punctuality.  (*Id.*)

## II.      <u>STANDARD OF REVIEW</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In reviewing summary judgment district courts "must view all of the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the non-moving party."  *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997).  However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is

---

[1] Plaintiffs also earned significantly more than the assistant store managers who supported them in performing their management tasks.  (*Id.* ¶ 49.)  Plaintiffs' total earning exceeded their assistant store managers' earnings by approximately 35 percent.  (*Id.*)  Plaintiffs also were eligible for bonuses that were significantly higher than those available to assistant store managers, as well as additional benefits not given to assistant store managers.  (*Id.* ¶ 48.)

that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

In a FLSA exemption case, "[t]he question [of] whether [a plaintiff's] particular activities excluded them from the overtime benefits of the FLSA is a question of law," while questions regarding how plaintiffs spent their working time are questions of fact. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986). Although FLSA overtime exemptions "are to be narrowly construed against the employers seeking to assert them," an employer "claiming an FLSA exemption does not bear any heightened evidentiary burden" on summary judgment. *Thomas v. Speedway Superamerica, LLC*, 506 F.3d 496, 501-02 (6th Cir. 2007). Thus, summary judgment is warranted where the undisputed facts show that plaintiffs meet the requirements of the relevant exemption. *See, e.g.*, *Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 626-28 (11th Cir. 2004) (affirming summary judgment based on administrative exemption); *Moore v. Tractor Supply Co.*, 352 F. Supp. 2d 1268, 1279 (S.D. Fla. 2004), *aff'd* 140 Fed. Appx. 168 (11th Cir. 2005) (entering summary judgment against retail manager under executive exemption).

Where, as here, a FLSA collective action has been conditionally certified but no ruling has been made as to whether the case will proceed to trial as a collective action, the district court may entertain summary judgment motions as to individual plaintiffs. *See Hogan*, 361 F.3d at 623 (affirming summary judgment against six "test plaintiffs" under administrative exemption in conditionally-certified FLSA collective action). In these circumstances, "[r]esolution of the issue regarding [one plaintiff], which may be common to other plaintiffs, does not hinder the purpose

of the collective action. . . ."  *Lindsley v. Bellsouth Telecomm., Inc.*, No. 07-6569, 2009 WL 322144 at *2 (E.D. La. Feb. 9, 2009).

III.   **ARGUMENT**

    A.   **Plaintiffs Were Exempt Executive Employees.**

    The FLSA exempts from its overtime requirements any person employed "in a bona fide executive . . . capacity."  *See* 29 U.S.C. § 213(a)(1).  Under regulations issued by the United States Department of Labor, employees are exempt "executives" under the Act if they (1) are compensated on a salary basis at a rate of not less than $455 per week, (2) have as their primary duty management of the enterprise which employs them, or of a customarily recognized subdivision thereof, (3) regularly direct the work of two or more employees, and (4) have the authority to hire or fire other employees or make recommendations regarding change of employee status that are given "particular weight."  *See* 29 C.F.R. § 541.100(a)(1)-(4).

    There is no dispute that plaintiffs satisfy the first and third requirements of the regulations.  Plaintiffs were paid an average annual salary of $43,250.00, the equivalent of $831 per week.  (*See* Stmt. of Facts ¶ 47.)  They accordingly earned, on average, nearly double the weekly salary required by the regulations.  *See* 29 C.F.R. § 541.602(a).  Plaintiffs also supervised far more than the two full-time employees that the regulations require.  *See* 29 C.F.R. § 541.104(a).  Indeed, by overseeing between 9-37 partners working between 350-500 total hours each week, the scope of plaintiffs' staff far exceeded that managed by other exempt retail managers.  *See, e.g.*, *In re Family Dollar FLSA Litig.*, -- F.3d --, 2011 WL 989558 at *4 (4th Cir. Mar. 22, 2011) (exempt retail manager supervised three to five employees); *Baldwin*, 266 F.3d at 1116-17 (exempt manager supervised two full-time employees).

Plaintiffs only contest (1) that their primary duty was management, and (2) whether they hired or terminated employees, or at a minimum made personnel recommendations that carried particular weight.  The undisputed facts compel the conclusion that they met these requirements.

### 1.    Plaintiffs' Primary Duty Was Management.

An employee's "primary duty" is "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  Primary duty is generally defined as what the employee does "that is of principal value to the employer, not the collateral tasks that [the employee] may also perform . . . ."  *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir. 1990). A "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  29 C.F.R. § 541.700(a).  However, the Department of Labor has identified four factors that generally should be considered when evaluating an employee's "primary duty": (1) the relative importance of the employee's exempt duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for non-exempt work.  *Id.*

Courts in this district and elsewhere have applied these factors to retail managers and repeatedly concluded that they have management as their primary duty as a matter of law, even if "they spent the majority of their time performing non-exempt tasks or . . . need[ed] to obey corporate policies and/or follow the orders of their corporate superiors."[2]  *Posely*, 433 F. Supp.

---

[2]  *Donovan v. Burger King Corp.*, 672 F.2d 221 (1st Cir. 1982) ("*Burger King I*"); *Donovan v. Burger King Corp.*, 675 F.2d 516, 520-22 (2d Cir. 1982) ("*Burger King II*"); *Soehnle v. Hess Corp.*, 399 Fed. Appx. 749, 2010 WL 4282188 (3d Cir. Nov. 1, 2010) (unpublished decision); *In re Family Dollar Litig.*, -- F.3d --, 2011 WL 989558 (4th Cir. Mar. 22, 2011); *Jones v. Va. Oil Co., Inc.*, 69 Fed. Appx. 633, 2003 WL 21699882 (unpublished decision) (4th Cir. July 23, 2003); *Lovelady v. Allsup's Conv. Stores, Inc.*, 304 Fed. Appx. 301, 2008 WL 5381348 (5th Cir. Dec. 23, 2008) (unpublished decision); *Speedway*, 506 F.3d at 508; *Baldwin*, 266 F.3d at

2d at 1302-03 (drug store managers); *see also Diaz v. Team Oney, Inc.*, 291 Fed. Appx. 947, 949, 2008 WL 4090642, at *2 (11th Cir. Sept. 3, 2008) (affirming entry of summary judgment against assistant manager of pizza delivery store); *Brillas v. Bennett Auto Supply Co.*, 675 F. Supp. 2d 1164, 1168-69 (S.D. Fla. 2009) (retail auto parts store manager); *Langley v. Gymboree Operations, Inc.*, 530 F. Supp. 2d 1297, 1302 (S.D. Fla. 2008) (retail store manager); *Moore*, 352 F. Supp. 2d at 1273-75 (retail store manager); *Severin v. Pasha's Rests., Inc.*, No. 04-21765-CIV, 2007 WL 967021, at *4-5 (S.D. Fla. Mar. 22, 2007) (restaurant shift manager).  Application of these factors to Starbucks store managers compels the same conclusion here.

---

1104; *Gellhaus v. Wal-Mart Stores, Inc.*, -- F. Supp. 2d --, 2011 WL 867232 (E.D. Tex. Mar. 10, 2011); *In re Dollar Gen. Stores FLSA Litig.*, -- F. Supp. 2d --, 2011 WL 197804 (E.D.N.C. Jan. 19, 2011); *Pierce v. Dogencorp, Inc.*, 2011 WL 398366 (M.D. Pa. Feb. 3, 2011); *Pollard v. GPM Investments, LLC*, 2011 WL 864329 (E.D. Va. Mar. 10, 2011); *Scott v. SSP Am., Inc.*, 2011 WL 1204406 (E.D.N.Y. Mar. 29, 2011); *Roberts v. Dolgencorp, Inc.*, 2010 WL 4806792 (M.D. Tenn. Nov. 18, 2010); *Guinup v. Petr-All Petroleum Corp.*, 2010 WL 3338800 (N.D.N.Y. Aug. 23, 2010); *Mayne-Harrison v. Dolgencorp, Inc.*, 2010 WL 3717604 (N.D. W. Va. Sept. 17, 2010); *Johnson v. DG Retail LLC*, 2010 WL 1929620 (D. Utah May 13, 2010); *Buechler v. Davco Rest., Inc.*, 2009 WL 3833999 (D. Md. Nov. 16, 2009); *Jackson v. Jean Coutu Group, Inc.*, No. CV206-194, 2007 WL 1850710 (S.D. Ga. June 26, 2007); *McClain v. McDonald's Corp.*, No. 05-1117, 2007 WL 210440 (E.D. Pa. Jan. 25, 2007); *Mims*, 2007 WL 10369, at *8; *Mitchell v. Abercrombie & Fitch, Co.*, 428 F. Supp. 2d 725 (S.D. Ohio 2006); *Addison v. Ashland, Inc.*, No. 04-40085, 2006 WL 752761 (E.D. Mich. Mar. 23, 2006); *Tyler v. Payless Shoesource, Inc.*, No. 2:05-CV-33-MEF, 2006 WL 2239168 (M.D. Ala. Aug. 4, 2006); *Jackson v. Advance Auto Parts*, 362 F. Supp. 2d 1323 (N.D. Ga. 2005); *Light v. Mapco Petroleum, Inc.*, No. 3:04-0460, 2005 WL 1868766 (M.D. Tenn. Aug. 4, 2005); *Kahn v. Superior Chicken & Ribs, Inc.*, 331 F. Supp. 2d 115 (E.D.N.Y. 2004); *Roberts v. Nat'l Autotech, Inc.*, 192 F. Supp. 2d 672 (N.D. Tex. 2002); *Kastor v. Sam's Club*, 131 F. Supp. 2d 862 (N.D. Tex. 2001); *Palazzolo-Robinson v. Sharis Mgmt. Corp.*, 68 F. Supp. 2d 1186 (W.D. Wash. 1999); *Haines v. Southern Retailers, Inc.*, 939 F. Supp. 441 (E.D. Va. 1996); *Thomas v. Jones Rests., Inc.*, 64 F. Supp. 2d 1205 (M.D. Ala. 1999); *Masilionis v. Falley's Inc.*, 904 F. Supp. 1224 (D. Kan. 1995); *Sturm v. TOC Retail, Inc.*, 864 F. Supp. 1346 (M.D. Ga. 1994); *Meyer v. Worsley Cos., Inc.*, 881 F. Supp. 1014 (E.D.N.C. 1994); *Glefke v. KFC Take Home Food Co.*, No. 92-74371, 1993 WL 521993 (E.D. Mich. Aug. 27, 1993); *Horne v. Crown Cent. Petroleum, Inc.*, 775 F. Supp. 189 (D.S.C. 1991); *Stein v. J.C. Penney Co.*, 557 F. Supp. 398 (W.D. Tenn. 1983); *Donovan v. Waffle House, Inc.*, No. C81-609A, 1983 WL 2108 (N.D. Ga. Sept. 26, 1983); *Marshall v. Sally Beauty Co., Inc.*, No. 80-4138, 1982 WL 2184 (E.D. La. Apr. 19, 1982).

### a.      Plaintiffs' Most Important Duties Were Managerial.

The relative importance of plaintiffs' managerial duties "requires one to consider the significance of the managerial tasks to the success of the facility."  *Mims*, 2007 WL 10369, at *4 (citations omitted); *see also, e.g., Burger King II*, 675 F.2d at 521.  "Under this factor, courts must compare the importance of plaintiff's managerial duties with the importance of her non-managerial duties, keeping in mind the end goal of achieving the overall success of the company."  *Speedway*, 506 F.3d at 505.  Plaintiffs performed virtually all of the tasks identified as "management" by the regulations: they interviewed, selected, and trained partners; set and adjusted their rates of pay and hours of work; directed their partners' work; created and maintained records for the use of supervision or control; appraised their partners' performance; addressed partner grievances; planned and apportioned work among their partners; determined how much product to order and stock in their stores; provided for the safety and security of their partners and stores; and took action to control their store's budget.  *See* 29 C.F.R. § 541.102; (Stmt. of Facts ¶¶ 10, 12, 14, 18, 20-23, 26, 33-37.)  These responsibilities were indisputably more important to Starbucks than any non-exempt work plaintiffs may have performed.

Plaintiffs were the highest ranking employees in stores that generated up to $1.35 million in annual revenue.  (Stmt. of Facts ¶¶ 2, 4.)  They were the partner in the store "ultimately in charge of all store operations," and they regularly performed tasks critical to the store's operation—preparing weekly schedules for 9-37 partners, ordering product, supervising and directing partners, interviewing and hiring applicants, training partners and evaluating their performance, analyzing store reports and using them to adjust practices, ensuring store safety and security, approving and processing store payroll, and ensuring compliance with company policies and procedures.  (*Id*. ¶¶ 3, 9, 10, 13-18, 20, 22, 26, 31-37.)  Plaintiffs' performance of these tasks

affected the store's overall performance, for which plaintiffs were held ultimately responsible. (*Id.* ¶ 8.)  Indeed, plaintiffs demonstrated the primacy of these tasks by highlighting them in their resumes over any barista tasks they may have performed.  (*See* Stmt. of Facts ¶ 2, Ex. 7.)

The primacy of plaintiffs' managerial tasks also is underscored by the manner in which Starbucks differentiated store managers from their subordinates.  Unlike their subordinates, plaintiffs spent four weeks of training focused on management functions such as leadership, scheduling, ordering, hiring, partner direction and evaluation, and disciplinary and policy issues.[3] (*See* Stmt. of Facts ¶ 7.); *see, e.g.*, *Mayne-Harrison*, 2010 WL 3717604 at *20 (management training demonstrates importance of managerial work).  After training, plaintiffs spent substantial time each month meeting with other managers to discuss hiring, promotions, and other store operational issues.  (*Id.* ¶¶ 40-42.)  Similarly, plaintiffs' job descriptions and evaluations (upon which their annual raise was based) focused on their leadership and management skills and the success of their stores, not on the performance of "barista" tasks such as making coffee that were the foundation of their subordinates' performance.  (*Id.* ¶¶ 2, 8.); *Mims*, 2007 WL 10369 at *4 n.6 (performance evaluation criteria for Starbucks store managers shows relative importance of management work); *Addison v. Ashland Inc.*, No. 04-40085, 2006 WL 752761, at *3 (E.D. Mich. Mar. 23, 2006).  And plaintiffs' bonuses were based on total store revenue, ability to control costs, and the overall customer service levels.  (*Id.* ¶ 48.); *Moore,* 325 F. Supp. 2d at 1275 (bonus based on store performance demonstrates that managerial duties more important).

Courts within this District have recognized that a retail store cannot "operate[] successfully unless [the store manager] was interviewing, selecting, and training employees,

---

[3]   Like all Starbucks managers, plaintiffs also were required to learn the roles of their subordinates so that plaintiffs could direct, teach, correct, develop, and evaluate their subordinates in these roles.  (*See, e.g.*, Stmt. of Facts ¶ 7, RMT Participant Guide at 3.)  This training thus facilitated plaintiffs' ability to manage their stores.

17

disciplining employees, and setting and adjusting rates of pay and hours of work of those employees." *Langley*, 530 F. Supp. 2d at 1302.[4]  Starbucks store managers are no less critical to the success of their stores.  As the district court observed in *Mims*:

> [A Starbucks store manager's] significant managerial functions–such as ordering and controlling inventory; deciding whom to interview and hire for barista positions; training and scheduling employees; special marketing promotions; and monitoring labor costs—were critical to the success of their respective stores…. If plaintiffs while each managing a store with annual sales exceeding $1 million were able to spend 70 or 80 percent of their time pouring coffee and performing other barista chores that six to 30 subordinates also performed, those activities of the manager quite obviously were of minor importance to [Starbucks] when compared to the significant management responsibilities performed during the other 20 to 30 percent of their time, management responsibilities that directly influenced the ultimate commercial and financial success or failure of the store.

*Mims*, 2007 WL 10369 at *6.  This factor accordingly supports plaintiffs' status as exempt.[5]

### b.  Plaintiffs Spent Substantial Time on Exempt Tasks.

The significant time plaintiffs devoted to managing their stores also supports their exempt status.  "[A]n employee's 'primary duty' cannot be ascertained by applying a simple 'clock' standard that contrasts the amount of time each day an employee spends on exempt and non-exempt work."  *Dalheim*, 918 F.2d at 1227.  Although the Department of Labor's regulations state that employees that spend more than 50 percent of their time on exempt tasks "will

---

[4] *See also, e.g., Speedway*, 506 F.3d at 505 (if plaintiff "failed to perform her managerial duties, her Speedway station would not function at all because no one else would perform these essential tasks"); *Burger King II*, 675 F.2d at 521.

[5] Plaintiffs undoubtedly will argue that the Eleventh Circuit's decision in *Morgan v. Family Dollar Stores, Inc.* creates a triable issue of fact as to the relative importance of plaintiffs' managerial duties, but *Morgan* is inapposite.  In *Morgan*, the court found that retail managers at small Family Dollar stores had few management responsibilities, and that these duties were relatively unimportant compared to their non-exempt work because their job description specifically identified the non-exempt work as an "essential job function" and the plaintiffs spent 90 percent of their time on this manual labor without being able to concurrently manage their employees.  *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1270 (11th Cir. 2008).  None of these circumstances are present here.  In addition, plaintiffs here possess far more managerial responsibility and other factors, including their job descriptions, manuals, evaluations, and substantially higher pay, show that management was their most important duty.

generally satisfy the primary duty requirement" based on this factor alone, they recognize that time is not the "sole test" of an employee's primary duty and that managers may be properly classified as exempt even if they spend less than 50 percent of his time on managerial tasks. *See* 29 C.F.R. § 541.700(b)-(c); *see also, e.g., Morgan*, 551 F.3d at 1270.

This is particularly true for retail managers who concurrently perform exempt and nonexempt work, where "a strict time division is somewhat misleading …:  one can still be 'managing' if one is in charge, even while physically doing something else." *Burger King I,* 672 F.2d at 226.  Thus, "[t]he 50 percent rule seems better directed at situations where the employee's management and non-management functions are more clearly severable than they are [in the retail context]." *Id.*  As the regulations explain, "an assistant manager in a retail establishment may perform work such as serving customers, cooking food, stocking shelves, and cleaning the establishment, but performance of such nonexempt work does not preclude the exemption if the assistant manager's primary duty is management."  29 C.F.R. § 541.106(b).

Plaintiffs here admit they spent at least 36-50 percent of their time performing *exclusively* management tasks.  (Stmt. of Facts ¶ 44.)  In addition, they spent time on the floor with their subordinates "constantly" monitoring, directing, evaluating, coaching, and training their subordinates.  (*Id.* ¶¶ 45-46.)  They also used time on the floor to "lead by example."  (*Id.*)  Plaintiffs here thus spent far *more* time on management tasks than other retail managers found to be exempt executives.  *See, e.g., In re Family Dollar Litigation*, -- F.3d --, 2011 WL 989558 at *5 (retail store manager that spent 80-90 percent of time on non-exempt duties exempt); *Baldwin*, 266 F.3d at 1113-14 (recreational park managers who spent 90 percent of their time on non-exempt duties exempt); *Posely*, 433 F. Supp. 2d at 1301 (retail store managers who spent approximately 80 percent of time on non-exempt tasks exempt); *Moore*, 352 F. Supp. 2d at 1273-

74 (retail store manager who spent more than 90 percent of time on non-exempt tasks exempt); *Jackson*, 362 F. Supp. 2d at 1334-36 (retail assistant store managers who spent 90 percent of time on non-exempt tasks exempt). The time factor thus also supports a conclusion that plaintiffs were exempt as a matter of law.[6]

### c.      Plaintiffs Were Relatively Free From Supervision.

The relative freedom from supervision factor also supports plaintiffs' exempt status. First, plaintiffs were the highest ranking partner in their stores the vast majority of the workweek. (*See* Stmt. of Facts ¶¶ 2, 42.) Although plaintiffs reported to a district manager, they saw their district manager at most once or twice per week, and frequently would not see them for months on end. (*Id*. ¶ 42.) When they did see their district manager, the visits often were brief. (*Id*.) Plaintiffs thus operated on a day-to-day basis "without a supervisor looking over [their] shoulder, monitoring [their] every move." *Speedway*, 506 F.3d at 507. "A district manager's periodic visits, as often as a few days each week, do not negate a finding that the store manager operates free from supervision when the district manager is absent."[7] *Speedway*, 506 F.3d at 507; *see*

---

[6] As with the relative importance factor, the decision in *Morgan* differs materially from plaintiffs here. In *Morgan*, the retail managers spent 90 percent of their time on non-exempt work, and could not manage their employees concurrently while unloading trucks or stocking product. *Morgan*, 551 F.3d at 1269-70. By contrast, plaintiffs here sometimes spent up to 50 percent of their time exclusively on exempt work, and also could manage while "on the floor." *See In re Family Dollar Litigation*, -- F.3d --, 2011 WL 989558 at *9 (distinguishing *Morgan* because plaintiffs could not concurrently manage while performing non-exempt work); *Mims*, 2007 WL 10369 at *6 (Starbucks store managers spent a minimum of 20-30 percent of time exclusively on exempt work, and concurrently managed staff at other times).

[7] Indeed, courts have routinely found assistant and department managers to be exempt executive employees, even where their superior works in close proximity to them on a daily basis. *See Burger King I*, 672 F.2d at 223 (assistant managers); *Burger King II*, 675 F.2d at 517 (same); *Jackson*, 362 F. Supp. 2d at 1335 (same); *Kastor*, 131 F. Supp. 2d at 867-68 (bakery department manager); *Masilionis*, 904 F. Supp. at 1224 (grocery department manager). These cases confirm that the factor "considers only the 'relative freedom from supervision'; it does not demand complete freedom from supervision, such that [the manager] is answerable to no one, as

*also, e.g.*, *Thomas*, 64 F. Supp. 2d at 1207 n. 4, 1213-14 (retail restaurant manager was still relatively free from supervision despite "a very hands-on supervisor" who called plaintiff at work "ten to 15 times a day and stopp[ed] by the restaurant three to seven days a week").  Thus, as the *Mims* court found, Starbucks store managers operated relatively free from supervision on a day-to-day basis in running their stores.  *Mims*, 2007 WL 10369, at *7.

Plaintiffs' "obvious degree of autonomy inherently associated with being the most senior on-site employee" is not diminished because plaintiffs may have had contact with their district manager via voicemail and e-mail.  *Speedway*, 506 F.3d at 507.  Plaintiffs admit that any such contacts could be infrequent, depending upon the district manager's management style.  (*See* Stmt. of Facts ¶ 42.)  Moreover, most of these electronic communications were of an administrative nature, often simply informing plaintiffs of a new promotion or product or reminding them of upcoming meetings.  (*Id.*)  Thus, as the *Mims* court found, neither the frequency nor content of communications with their district managers changes the fact that plaintiffs operated their stores on a daily basis relatively free from oversight.  *Mims*, 2007 WL 10369, at *7; *see also, e.g., Speedway*, 506 F.3d at 506-07 (manager relatively free from supervision despite daily e-mails); *Posely*, 433 F. Supp. 2d at 1292 (manager relatively free from supervision despite daily telephone or e-mail communication); *Moore*, 352 F. Supp. 2d at 1277-78 (manager relatively free from supervision despite telephone and e-mail contact).

Plaintiffs' relative freedom from supervision also is demonstrated by the discretion they exercised in running their stores.  When it came to hiring, plaintiffs used their discretion to decide whom to interview and made the decision regarding which baristas to hire.  (Stmt. of Facts ¶¶ 10-12.)  When it came to performance reviews, plaintiffs determined what ratings to

---

this would disqualify all but the chief executive officer from satisfying this factor of the primary duty inquiry."  *Speedway*, 506 F.3d at 506-07.

give partners.  (*Id.* ¶ 22.)  When it came to discipline, plaintiffs decided which conduct required correction and what degree of discipline to impose.  (*Id.* ¶¶ 27-29.)  When it came to promotions to shift supervisors, plaintiffs decided which baristas to promote or recommend for promotion. (*Id.* ¶ 25.)  When it came to ordering, plaintiffs decided whether to make adjustments from the "par" levels set by the company.  (*Id.* ¶ 32.)  When it came to store scheduling, plaintiffs decided which adjustments to make to the schedule, balancing business concerns and the desire to accommodate individual partners.  (*Id.* ¶¶ 18-19.)  Plaintiffs' discretion in these important areas further demonstrates that they operated relatively free from direct supervision.[8] *See, e.g., Mims*, 2007 WL 10369, at *6-7 (discussing Starbucks store managers' discretion).  That plaintiffs' decisions in other areas may have been subject to corporate guidelines or district manager review "does not undermine the importance of [p]laintiffs' managerial duties or the discretion" the managers exercised.  *Posely*, 433 F. Supp. 2d at 1304.  Plaintiffs here had far more discretionary authority than many managers held to be exempt, demonstrating that they are exempt executives as a matter of law.  *See Mims*, 2007 WL 10369, at *7.

> **d.    Plaintiffs' Compensation Reflects Their Managerial Responsibilities.**

Finally, the substantial differences between plaintiffs' salaries and the hourly wages earned by lower level employees shows that Starbucks primarily valued plaintiffs' management duties.  Plaintiffs' salaries were up to three or four times the annual wages earned by their shift supervisors and baristas, and 35 percent higher than their assistant store managers' salaries.  (*See* Stmt. of Facts ¶ 49.)  Plaintiffs also were eligible for thousands of dollars in bonuses that were unavailable to their subordinates, as well as tens of thousands of dollars in additional benefits.

---

[8] In *Morgan,* by contrast, the court upheld a jury finding that managers were non-exempt where evidence showed that "the few decisions not mandated by the manuals and corporate headquarters are vested in the district manager."  *Morgan*, 551 F.3d at 1270-71.

(*Id*. ¶ 48)  "This marked disparity in pay and benefits between [Starbucks store managers] and the[ir] non-exempt employees is a hallmark of exempt status."  *Mims*, 2007 WL 10369, at *8; *see also, e.g., Moore*, 352 F. Supp. 2d at 1278-79.

Even if plaintiffs' salaries were converted to a fictional "hourly rate," they still earned far in excess of their subordinates.  Assuming for present purposes that plaintiffs' claimed average work hours are true, plaintiffs still earned an average "hourly rate" of $19-20 per hour, more than double the hourly rate paid to their baristas and an average of 70 to 80 percent higher than their shift supervisor's hourly rate.  (*See* Stmt. of Facts ¶ 49.)  These significant discrepancies further demonstrate that plaintiffs' primary duty was management.[9]  *See, e.g., Speedway*, 506 F.3d at 509 (30 percent difference shows exempt status).

### 2. Plaintiffs' Personnel Recommendations Received "Particular Weight."

Plaintiffs also satisfy the regulations requirement that they have the authority to hire *or* fire other employees *or* make recommendations regarding change of employee status that are given "particular weight."  29 C.F.R. § 541.100(a)(4).  The undisputed evidence shows that plaintiffs made the ultimate decision to hire new baristas into their stores.  (Stmt. of Facts ¶¶ 10-12 .)  Plaintiffs accordingly satisfy this requirement.  29 C.F.R. § 541.100(a)(4).

Plaintiffs' authority in the areas of termination and promotion also satisfy the requirement.  Plaintiffs testified that it was their duty as a store manager to regularly recommended that partners be terminated or promoted, or to promote or terminate partners on their own.  (Stmt. of Facts ¶¶ 25, 30.)  They further admitted that their recommendations were

---

[9] In *Morgan,* the Eleventh Circuit concluded that the store managers' compensation could be viewed as favoring either side, even though the Family Dollar managers at issue earned the same amount *or less* on an hourly basis than many Starbucks baristas.  *Compare Morgan*, 551 F.3d at 1257-58 (store managers earned effective rate of $8.57-9.99 per hour) *with* Stmt. of Facts ¶ 49 (baristas earning $7.50-10 per hour).

almost uniformly followed.  (*Id.*)  These recommendations as to promotions and termination

carried "particular weight" under the regulations.  *See* 29 C.F.R. § 541.105 (factors pertinent to

"particular weight" determination are: (1) whether the employee's job duties include making

such recommendations; (2) the frequency with which recommendations are made; and (3) the

frequency with which recommendations are relied upon; "[a]n employee's suggestions and

recommendations may still be deemed to have 'particular weight' even if a higher level

manager's recommendations are more important and even if the employee does not have the

authority to make the ultimate decision as to the employee's change in status."); *Rozenblum v.

Ocean Beach Props.*, 436 F. Supp. 2d 1351, 1363-64 (S.D. Fla. 2006) (requirement met where

plaintiff made recommendations about performance and status).  Plaintiffs thus meet all of the

criteria for exempt executive employees as a matter of law.

### B. Plaintiffs Cannot Establish That Starbucks Willfully Misclassified Store Managers.

Summary judgment also should be entered on plaintiffs' claims to the extent they accrued

more than two years prior to the filing of their consent to join this lawsuit.  These claims are

barred under the FLSA's two-year statute of limitations.  *See* 29 U.S.C. § 255(a).

Although the FLSA extends the statute of limitations to three years where a violation is

"willful," this extended limitations period is available only where the plaintiff can prove by a

preponderance of the evidence that the defendant "knew or showed reckless disregard" that its

conduct violated the FLSA.  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 134 (1988).  Under

this standard, an employer who "acts unreasonably but not recklessly" has not acted "willfully."

*Allen v. Board of Pub. Ed. for Bibb Cnty.*, 495 F.3d 1306, 1324 (11th Cir. 2007).

Plaintiffs cannot meet this standard here.  Starbucks made a considered decision to

classify store managers as exempt after a detailed review of the position by compensation

professionals, and again in 2004 after the exemption regulations were revised.  (Stmt. of Facts ¶¶ 50-51.)  This classification was confirmed as correct by a federal District Court in *Mims.  Mims*, 2007 WL 10369, at *1-8.  No reasonable juror could conclude that Starbucks "showed reckless disregard" that it had misclassified its store managers as exempt under these circumstances.  *See, e.g.*, *Smith v. Heartland Auto. Serv., Inc.*, 418 F. Supp 2d 1129, 1141-42 (D. Minn. 2006) (entering summary judgment on issue of willfulness of misclassification of managers despite evidence that company had knowledge employees spent most of time performing non-exempt work); *cf. Saxton v. Young*, 479 F. Supp. 2d 1243, 1253-54 (N.D. Ala. 2007) ("The Eleventh Circuit is hesitant to find 'willful' behavior…, even when presented with strong evidence of an employer's violation of the FLSA").  Summary judgment against the 155 plaintiffs whose claims are barred by the two-year statute of limitations is therefore appropriate.  (Stmt. of Facts ¶ 53.)

> **C.**     **Summary Judgment Should Be Entered As To Plaintiffs That Have Waived Their Claims.**

Summary judgment also is appropriate as to those plaintiffs that have waived their FLSA claims against Starbucks.  An employee may validly waive claims under the FLSA if their waiver is monitored and approved by a court or the U.S. Department of Labor.  *See, e.g., Lynn's Food Stores v. U.S.*, 679 F.2d 1350, 1352 (11th Cir. 1982).  Seventeen plaintiffs executed such a waiver in connection with the settlement of *Pendlebury v. Starbucks Corporation*.  (*See* Stmt. of Facts ¶ 53.)  They accordingly may no longer bring suit against Starbucks regarding their exempt status. *See, e.g., Lynn's Food Stores*, 679 F.2d at 1352.  Summary judgment therefore should be entered on their claims.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant defendant Starbucks Corporation's motion for summary judgment.

Dated: May 6, 2011

Respectfully submitted,


 /s/ Susan N. Eisenberg
Susan N. Eisenberg, Esq. (Fla. Bar No. 600393)
susan.eisenberg@akerman.com
AKERMAN SENTERFITT
1 S.E. 3rd Avenue
28th Floor
Miami, FL 33131
(305) 374-5600
(305) 374-5095 (facsimile)

Daniel L. Nash
dnash@akingump.com
Nathan J. Oleson
noleson@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue, NW
Washington, D.C. 20036
(202) 887-4000
(202) 887-4288 (facsimile)

ATTORNEYS FOR DEFENDANT
STARBUCKS CORPORATION

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of Defendant Starbucks Corporation's

Motion for Summary Judgment and Incorporated Memorandum of Law was electronically filed

with the Clerk of the Court using CM/ECF this 6th day of May 2011. I also certify that the

foregoing document is being served this day on all counsel of record identified on the Service

List via transmission of Notice of Electronic Filing generated by CM/ECF.


   /s/ Susan N. Eisenberg         
  Susan N. Eisenberg, Esq.

## SERVICE LIST

**CASE NO. 09-60073-CIV-DIMITROULEAS/SNOW**

Daniel R. Levine, Esq.
Adam S. Chotiner, Esq.
Robin I. Cohen, Esq.
Shapiro, Blasi, Wasserman & Gora, P.A.
7777 Glades Road, Suite 400
Boca Raton, FL 33434
(561) 477-7800
(561) 477-7722 (facsimile)

Susan N. Eisenberg, Esq.
Fla. Bar No. 600393
susan.eisenberg@akerman.com
AKERMAN SENTERFITT
1 S.E. 3rd Avenue
28th Floor
Miami, FL 33131
(305) 374-5600
(305) 374-5095 (facsimile)

Daniel L. Nash
dnash@akingump.com
Nathan J. Oleson
noleson@akingump.com
Juliet Gray
jegray@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue, NW
Washington, D.C. 20036
(202) 887-4000
(202) 887-4288 (facsimile)